IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE FIRST LIBERTY INSURANCE CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:16-cv-199-SPB |
| PAUL MCGEEHAN AND ROSANNE MCGEEHAN, HUSBAND AND WIFE, AND ADAM MCGEEHAN AND LAURA MCGEEHAN, HUSBAND AND WIFE, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff, the First Liberty Insurance Corporation ("First Liberty"), commenced this declaratory judgment action seeking a determination of its rights and responsibilities under two insurance policies issued to Paul and Rosanne McGeehan. The named Defendants – Paul, Rosanne, Adam, and Laura McGeehan (collectively, "Defendants") -- have counterclaimed for the disputed insurance proceeds.[1] The Defendants claim entitlement to stacked underinsured motorist ("UIM") benefits on behalf of Adam and Laura McGeehan, who were involved in a serious accident while traveling in a vehicle that was covered by one of the policies in question.

Presently pending before the Court is First Liberty's motion for summary judgment and Defendants' cross-motion for partial summary judgment. For the reasons set forth below, Defendants' motion will be denied and First Liberty's motion will be granted.

---

[1] This Court has subject matter jurisdiction over First Liberty's declaratory judgment claim pursuant to 28 U.S.C. §§2201 and 2202. In addition, the Court has supplemental jurisdiction over Defendants' counterclaim pursuant to 28 U.S.C. §1367.

1

I.  **BACKGROUND**

On November 30, 2013, Adam McGeehan ("Adam") and his wife Laura ("Laura") were traveling in a Chevy Trailblazer, when they were struck by a vehicle operated by William Schick ("Schick"), resulting in injuries to both Adam and Laura. PCSF ¶¶1, 6; DCSF ¶1.[2] Schick's insurance carrier paid the liability limits of his policy for bodily injury. PCSF ¶2.

At the time of the accident, the subject Trailblazer was covered by a four-vehicle policy (No. AO628812439610) issued by First Liberty to Paul and Rosanne McGeehan (hereafter, the "Four Vehicle Policy"). PCSF ¶¶3, 6; DCSF ¶¶2, 4. Adam, the biological son of Paul and Rosanne McGeehan, was listed as a driver on this Policy. PCSF ¶¶7-8; DCSF ¶3.

The Four Vehicle Policy includes a stacking endorsement that provides for the bodily injury limit of $300,000 to be stacked for each of the four vehicles listed on that policy. PCSF ¶¶9-10; DCSF ¶5. First Liberty has paid $300,000 in underinsured motorist ("UIM") benefits to Adam and Laura under the Four Vehicle Policy, but has rejected their claim for stacked UIM coverage, which totals $900,000. PCSF ¶¶10-11; DCSF ¶6.

At the time of the accident, Paul McGeehan also held an insurance policy (No. AO628812439650), issued by First Liberty, on a Lincoln Navigator (the "Lincoln Navigator Policy"). PCSF ¶¶12-14. The Lincoln Navigator Policy provides UIM coverage with a liability limit of $300,000 per accident. It also contains an endorsement that allows stacking of UIM benefits. PCSF ¶¶16-17; DCSF ¶7. First Liberty rejected Adam and Laura's claim under this policy as well. DCSF ¶8.

---

[2] The citation "PCSF" refers to Plaintiff's Concise Statement of Material Facts, ECF No. 57, and Defendants' responses thereto, ECF No. 60. The citation "DCSF" refers to Defendants' Concise Statement of Material Facts, ECF No. 53, and Plaintiff's response thereto, ECF No. 62.

The parties agree that Adam and Laura are entitled to stack UIM coverages only if they are "family members" of the named insured, as defined in the policies. DCSF ¶11. Both the Four-Vehicle Policy and the Lincoln Navigator Policy define "family member" to mean:

> a person related to you [i.e., the insured] by blood, marriage or adoption who is a resident of your household. This includes a ward or foster child.

PCSF ¶22; DCSF ¶10.

Although it is undisputed that that Adam and Laura are related to the named insureds by blood and by marriage, First Liberty maintains that the term "family member" also includes a residency requirement. According to First Liberty, Adam and Laura were not "residents" of Paul and Roseann McGeehan's household at the time of the accident and, therefore, they do not qualify for the stacked UIM coverage.

Defendants dispute First Liberty's position on two fronts. First, they argue that the "residency" requirement applies only to family members who are related to the insured through adoption; second, they argue that, even if "residency" is a requirement of the policy, they satisfy that prerequisite. Having reviewed the entirety of the summary judgment record, the Court finds these issues to be adequately joined and ripe for resolution.

## II. STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a motion under Rule 56, the Court must construe the evidence and all reasonable inference arising therefrom in the light most favorable to the non-movant. *Scott v. Harris,* 550 U.S. 372, 378 (2007).

## III. DISCUSSION

Under Pennsylvania law,[3] the goal in construing and applying the language of an insurance contract is to effectuate the intent of the parties as manifested by the language of the specific policy. *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005); *Lititz Mut. Ins. Co. v. Steely,* 785 A.2d 975, 978 (Pa. 2001). When interpreting the policy, the court must read it as a whole and construe its meaning according to its plain language. *Spector v. Fireman's Fund Ins. Co.*, 451 F. App'x 130, 136 (3d Cir. 2011). "Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999). "Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Id.* (quoting *Hutchison v. Sunbeam Coal Co.*, 519 A.2d 385, 390 (Pa. 1986)). "Courts, however, should not read ambiguity into contracts." *Selective Way Ins. v. Travelers Prop. Cas. Co. of Am.*, 724 F. Supp. 2d 520, 525 (E.D. Pa. 2010) (citing *Madison Constr. Co.*, 735 A.2d at 106).

To resolve the parties' dispute about UIM coverage in this case, the Court must interpret the relevant language of the insurance policy. *See Madison Constr. Co.*, 735 A.2d at 106 (explaining that the court, rather than a jury, is tasked with interpreting an insurance contract). The Court must first determine whether Adam and Laura were required to be "residents" of Paul and Roseanne McGeehan's household as a condition of coverage. If so, the Court must

---

[3] The parties agree that Pennsylvania law governs their dispute.

determine whether there is sufficient evidence of their residency to withstand summary judgment.

> A. *Do the Policies in Question Impose a Residency Requirement on all Categories of "Family Members?"*

The specific dispute in this case pivots on the definition of "family member" as set forth in the subject policies. Under both policies:

> "Family member" means a person related to [the insured] by blood, marriage or adoption who is a resident of [the insured's] household. This includes a ward or foster child.

PCSF ¶22; DCSF ¶10.

First Liberty interprets this definition to mean that a "family member" must be both (a) a person who is related to the insured by blood, marriage or adoption, **and** (b) a resident of the insured's household. Thus, First Liberty's theory is that all classes of family members identified in the policy's definition must be residents of the policyholder's household.

Defendants, on the other hand, argue that the definition of "family member" is patently ambiguous because it is susceptible to at least two different constructions. As an alternative to First Liberty's proffered interpretation, Defendants maintain that the definition can be read to mean that "blood" relatives and those related by "marriage" automatically qualify as "family members," while those related by *adoption* are covered only if they *are also residents* of the household. Both sides agree that, if the definition is read in this manner, then Adam and Laura are "family members" under the subject policies, and thereby entitled to stacked UIM coverage.

Defendants argue that their proposed interpretation comports with the "last antecedent rule," which holds that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 136 S. Ct. 958, 962 (Mar. 1, 2016) (Sotomayor, J.) (citing Blacks' Law Dictionary 1532-33 (10th ed. 2014) and

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 144 (2012)). Pennsylvania courts have applied this rule in the context of interpreting contracts, including insurance policies. *See Buntz v. Gen. Am. Life Ins. Co.*, 7 A.2d 93, 95 (1939) (group life insurance policy); *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 418–19 (3d Cir. 2011) (accidental death and dismemberment policy); *Lee v. Sixth Mount Zion Baptist Church of Pittsburg*, No. CV 15-1599, 2017 WL 3608140, at *20 (W.D. Pa. Aug. 22, 2017) (employment contract), *aff'd*, 903 F.3d 113 (3d Cir. 2018). Applying this rule to the instant case, Defendants argue that the absence of a comma before the modifying phrase ("who is a resident of your household") introduces ambiguity because that phrase can reasonably be understood as applying only to those individuals who are related to the insured through adoption. *Viera,* 642 F.3d at 419.

Importantly, however, the "last antecedent rule" is "not an inflexible and uniformly binding rule." *Midboe v. State Farm Mut. Auto Ins. Co.,* 433 A.2d 1342, 1347 (Pa. 1981) (citation omitted); *see also Viera,* 642 F.3d at 419 ("[T]he last-antecedent rule is not an absolute and can assuredly be overcome by other indicia of meaning."). "Where the meaning of the contract language is clear, the last-antecedent rule should not be used to create ambiguity." *Viera,* 642 F.3d at 419.

Defendants argue that, if First Liberty sought to impose a residency requirement on all categories of "family members," it could have easily made its intentions clear simply by placing a comma after the word "adoption." Assuming Defendants are correct that the proposed change would have made the policy language clearer, it does not necessarily follow that the language as presently written is ambiguous as a matter of law. In numerous cases, federal and state courts within this Commonwealth have interpreted identical definitions of the term "family member" in the manner that First Liberty presently advocates -- i.e., restricting all categories of "family

members" to those who reside in the insured's household. *See, e.g., Atl. States Ins. Co. v. Bubeck*, No. 1949 MDA 2012, 2013 WL 11251558, at *3 (Pa. Super. Ct. Oct. 17, 2013) (stating, based on identical policy language, that "appellant is only covered by the policy if he is a resident of his parents' household"); *see also Courter v. Westfield Ins. Co.*, No. 3:CV-13-2010, 2014 WL 5474581, at *2 (M.D. Pa. Oct. 28, 2014) ("The parties agree that if decedent was not a family member who was a resident of his grandmother's household, . . . , at the time of the February 22, 2012 accident, then he was not an insured as defined in his grandmother's policy with Defendant."); *Kaylor v. Donegal Mut. Ins. Co.*, No. 1068 WDA 2012, 2013 WL 11272836, at *3 (Pa. Super. Ct. Mar. 19, 2013) (determining, based on identical policy language, that the insured's mother was entitled to UIM benefits as a "family member" because she was a "resident" of insured's household at the time of the accident); *Merchants Mut. Ins. Co. v. Benchoff*, No. CIV.A. 09-418, 2010 WL 2245572, at *8 (W.D. Pa. May 10, 2010), (stating, in dicta: "'Family Member' is defined in the UIM Endorsement as 'a person related to an individual Named Insured by blood, marriage or adoption who is a resident of such Named[ ] Insured's household, . . . .' . . . [the claimant] would not qualify as a family member under the Policy since it appears that he does not reside in the same household with an individual Named Insured."), *report and recommendation adopted*, No. CIV.A. 09-418, 2010 WL 2196321 (W.D. Pa. June 1, 2010); *Travelers Pers. Ins. Co. v. Estate of Parzych*, 675 F. Supp. 2d 505, 511 (E.D. Pa. 2009) (granting summary judgment in favor of insurance company, where, based on an identical definition of "family member," the decedent was not a "resident" of the insured's household at the time of the underlying accident); *Norman v. Pennsylvania Nat. Ins. Co.*, 684 A.2d 189, 190-91 (Pa. Super. Ct. 1996) (same); *Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co.*, 545 A.2d 343, 344 (Pa. Super. Ct. 1988) (stating that the policy, which contained an identical

7

definition of "family member," "provided coverage for family members of the insured, Dr. Hagerty, who were residents of his household.")

Despite this precedent, Defendants point to conflicting expert opinions in this case as confirmation that the definition of "family member" is ambiguous. Included in the summary judgment record are the reports of four experts. Two of the experts -- Elizabeth Kons, Director of the Writing and Research Center at Gannon University, and Alan M. Perlman, Ph.D., a forensic linguistics expert -- were retained by the Defendants. Ms. Kons opines that the policy provision defining "Family Member" is "indeed ambiguous" due to the absence of a coordinate comma after the word "adoption." ECF No. 53-1. "Structurally," she states, "the clause does not grammatically submit that a person related by blood need[s] to be a resident of the house to mean 'family member.'" *Id*. Dr. Perlman indicates in his report that he was "asked to comment on the ambiguity, if any, of the first sentence" of the definition of "Family Member." ECF No. 53-2. He concludes that

> the definition of "family member" at issue, though grammatical, is also obscure and elliptical, lacking the connecting and emphasizing words that would allow a clear meaning to emerge. Also, final relative clauses with multiple possible antecedents create ambiguity; one cannot tell which of the preceding noun phrases the relative clause modifies, if not all of them. If *adoption* is taken to mean 'person related by adoption,' then another meaning is clearly possible.

*Id*. (italics in the original).

Under Federal Rule of Evidence 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if, among other things, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The interpretation of an insurance policy presents a pure question of law for the court. *Rourke v. Pa. Nat. Mut. Cas. Ins. Co.*, 116 A.3d 87, 91 (Pa. Super. Ct. 2015).

Similarly, whether an insurance policy is ambiguous is a question of law. *Porter v. Safeco Ins. Co. of Illinois*, No. 3:15-CV-759, 2017 WL 1103169, at *3 (M.D. Pa. Mar. 24, 2017). Accordingly, the opinions of Defendants' experts are not admissible under Rule 702 insofar as they opine on questions of ambiguity or contractual meaning, as those are questions of law for this Court to resolve. *See Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.,* 410 F.Supp.2d 417, 420–21 (E.D. Pa. 2006) (holding that expert's opinion on the application of the insurance policy to plaintiff's loss are impermissible legal conclusions because expert's "opinions on the issue of contract construction would not assist the jury in understanding coverage"); *Crink v. People's Benefit Life Ins. Co.,* No. CIV.A.04–1068, 2005 WL 730688, at *4 (E.D. Pa. Mar. 29, 2005) (finding that expert's report was inadmissible because it was "littered with impermissible legal conclusions on the issue of contract construction."); *Green Mach. Corp. v. Zurich Am. Ins. Grp.*, No. CIV. A. 99-3048, 2001 WL 1003217, at *6 (E.D. Pa. Aug. 24, 2001), *aff'd*, 313 F.3d 837 (3d Cir. 2002) (court would not consider the report of expert who opined that the provisions of the insurance contract at issue were ambiguous, since whether a contract provision is ambiguous is a question of law for the court) (citing authority).

In support of their proffered interpretation, Defendants contend that there is a logical basis for an insurer to treat adoptees differently than blood relatives and marital relatives: *to wit*, "[r]equiring adopted family members to also reside in the insured's household provides insurance carriers with an additional safeguard against potential exploitation of the otherwise laudable adoption process, aimed solely to provide coverage to an individual who might otherwise have no coverage, irrespective of any real closeness in [the] relationship." ECF No. 52 at 11. It seems unlikely, however, that individuals will undertake the time-consuming and costly process of legal adoption – along with all of the potential ensuing expenses and responsibilities

9

related to legal guardianship – merely for the hypothetical benefit of expanding the adoptee's access to insurance benefits.

In sum, the Court must accord the policy provisions their accepted meanings; it cannot distort the plain meaning of the disputed definition merely to find an ambiguity. *Kaylor*, 2013 WL 11272836, at *2. Nor will the Court "find a particular provision ambiguous simply because the parties disagree on the proper construction." *Brown v. Everett Cash Mut. Ins. Co.,* 157 A.3d 958, 962 (Pa. Super. Ct. 2017). Rather, if possible, the Court will read the provision to avoid an ambiguity. *Id.* And, "[w]here there is only one reasonable interpretation of a contract, that interpretation controls because [s]traightforward language in an insurance policy should be given its natural meaning." *Viera*, 642 F.3d at 419-20. For the reasons discussed, Defendants' proposed reading of the definition of "family member," pursuant to the "last antecedent rule" is not accepted by the Court, which finds that the clear and unambiguous meaning of the UIM endorsement is that all categories of "family members" must be residents of the insured's household. Accordingly, Defendants' motion for partial summary judgment must be denied.

B. *Were Adam and Laura McGeehan "Residents" of Paul and Roseanne McGeehan's Household at the Time of the Accident*?

The Court turns next to the question of whether Adam and Laura were "residents" of Paul and Rosanne McGeehan's household at the time of the accident. Although "resident" is not defined in the subject policies, "[c]ourts of this Commonwealth have held the term 'resident' to have a more transitory meaning when it does not contain qualifying terms of refinement, like 'permanent' or 'legal.'" *Kaylor,* 2013 WL 11272836, at *3. The term "generally requires 'at the minimum, some measure of permanency or habitual repetition.'" *Id.* (citing *Erie Exchange v. Weryha*, 931 A.2d 739 (Pa. Super. Ct. 2007), and Merriam Webster's Collegiate Dictionary 681, 996 (10th ed.1996)). "In determining a person's residence, Pennsylvania courts look at factors

such as where a person sleeps, takes meals, receives mail, and stores personal possessions." *Id.* "[W]hen a person actually lives in one location, and sporadically visits, or keeps certain personal items at another location, it is the location where he lives that is his residence." *Id. (citing Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co.*, 545 A.2d 343, 347–48 (Pa. Super. Ct. 1988), and *Laird v. Laird*, 421 A.2d 319, 321 (Pa. Super. Ct. 1980)). A person's own subjective intentions and perceptions about residency are not determinative. *Mu'Min v. Allstate Prop. & Cas. Ins. Co.*, No. CIV.A. 10-7006, 2011 WL 3664301, at *9 (E.D. Pa. Aug. 17, 2011).

In this case, the record establishes the following facts. Since 2011, Adam and Laura have shared an apartment together in Virginia, where they both work as teachers. ECF No. 56-3 at 6; ECF No. 56-4 at 12-13. Adam and Laura were married in August 3, 2013, less than four months prior to the date of the accident. ECF No. 56-3 at 4. After getting married in Erie and honeymooning in Hawaii, they returned to their jobs in Virginia. ECF No. 56-4 at 18, 66.

While Adam was teaching in Virginia, he enrolled in a Ph.D. program at George Mason University. DAMF ¶2.[4] Although Adam had completed a form to apply for in-state tuition, as of the time of the accident, he was being charged out-of-state tuition, which his father paid. DAMF ¶16; ECF No. 56-4 at 42.

Throughout the course of 2013, Adam and Laura returned to Erie approximately 10 to 15 times. DAMF ¶1. During the summer, when his school district was out of session, Adam would travel to Erie after his classes at George Mason University had ended for the week. DAMF ¶3. Laura remained in Erie during the summer of 2013. DAMF ¶4.

---

[4] The citation "DAMF" refers to Defendants' Additional Material Facts, ECF No. 60, and Plaintiff's responses thereto, ECF No. 65.

11

Prior to getting married, Adam stayed with his parents when in Erie, and Laura stayed with her parents. ECF No. 56-3 at 8; ECF No. 56-4 at 61-62, 64-66. After they got married, Adam and Laura would stay together, either at Adam's parents' house or at Laura's parents' house, when they travelled to Erie. ECF No. 56-3 at 8-13; ECF No. 56-4 at 28. Adam did not carry a key to his parents' house, but he had access to a key on the premises. ECF No. 56-4 at 74-75.

Adam and Laura were staying at the McGeehans' house, located on Downhill Drive, during the weekend of the accident, and they were returning to that location at the time their vehicle was struck. DAMF ¶ 5. Adam testified that he and Laura had returned to the Erie area on three occasions after getting married: Labor Day weekend, Columbus Day weekend, and Thanksgiving weekend, when the accident occurred. *Id.* Adam could not recall whether he and Laura had stayed at her parents' home during any of these visits. ECF No. 56-4 at 28, 66-67. Laura testified that Thanksgiving weekend was the fourth occasion on which she and Adam had stayed at Downhill Drive after their marriage. ECF No. 56-3 at 8-13.

Immediately after the accident, Adam was hospitalized in Erie. His discharge summary from the hospital lists his Virginia address as his home address. ECF No. 56-4 at 53-54. In 2014, Adam received physical therapy in Erie. ECF No. 56-4 at 54-55. At that time, Laura had returned to work in Virginia. Id. Since returning to Virginia following his accident, Adam has received medical care in Virginia. ECF No. 56-4 at 69.

As of the time of the accident, Adam kept clothes and personal belongings at Downhill Drive and maintained the same bedroom from his youth. DAMF ¶ 7. That bedroom was used solely for Adam and Laura, to the exclusion of others. DAMF ¶ 8. Laura kept only a few items at Downhill Drive, such as a toothbrush, pajamas, and possibly a couple t-shirts. ECF No. 56-3

at 13.  She would pack a suitcase or bag when traveling from Virginia to Erie, and she also kept some items at her parents' house in Erie.  ECF no. 56-3 at 13.  When spending time at Downhill Drive in 2013, Adam regularly contributed to the purchase of food and other items.  DAMF ¶8.

Adam received some mail at Downhill Drive, including bank statements, investment records, credit card statements, and college alumni mailings.  DAMF ¶9.  In addition, his birth certificate and passport were kept at the Downhill Drive residence.  Id. ¶10.  Adam also testified, however, that he viewed financial and credit card statements on-line and paid his credit card bill on-line.  ECF No. 56-4 at 33, 38-39, 49-50, 74-75.  Adam received some mail, including cards and wedding invitations, at his Virginia address.  ECF No. 56-4 at 73-74.  Laura received her mail in Virginia and did not receive any mail at Downhill Drive.  ECF No. 56-3 at 21.

Adam and Laura have a joint account at a federal credit union in Virginia.  ECF No. 56-3 at 21; ECF No. 56-4 at 49.  Adam receives direct deposits of his paychecks into this account.  ECF No. 56-4 at 51.  Although Adam also has a PNC account, he withdraws money from that account in Virginia.  ECF No. 56-4 at 49.

Adam's permanent address, on file with his employer-school district, is listed as Downhill Drive.  DAMF ¶11.  His W-2 form lists his Arlington, Virginia address as his home address, while Laura's W-2 form lists the home of her parents as her address.  ECF No. 56-6.  Adam and Laura used an Erie-based accountant to prepare their tax return. DAMF ¶12.  Their joint tax return lists their Arlington, Virginia address as their home address.  ECF No. 56-6.

At the time of the accident, Adam possessed a Virginia driver's license and was registered to vote in Virginia.  DAMF ¶17.  His primary vehicle was the Chevy Trailblazer, which had a Pennsylvania license plate and was registered to Paul McGeehan.  ECF No. 56-4 at 20-21.  Laura obtained a Virginia driver's license shortly after getting married and registered her

13

vehicle in Virginia. ECF No. 56-3 at 7. Laura was registered to vote in Pennsylvania in 2013. DAMF ¶14.

Viewing all of the foregoing facts in the light most favorable to the Defendants, the Court concludes, as a matter of law, that Adam and Laura were not "residents" of Paul and Rosanne McGeehan's household at the time of the accident. As of November 2013, Adam and Laura had been living and working in Virginia for approximately two years; consequently, their apartment in that Commonwealth is where they maintained their regular physical presence, took meals, slept, received mail, and kept their possessions. Although the case for residency is stronger for Adam than for Laura, even Adam's contacts with his parents' home nevertheless fail to satisfy the "minimum measure of permanency or habitual repetition" necessary for establishing that he was a resident there. *See Quincy Mut. Fire Ins. Co. v. Clyman,* 910 F. Supp. 230, 232 E.D. Pa. 1996) ("Courts confronted with insurance policies that distinguish the residents of an insured's household have . . . construed such contracts to differentiate those family members who actually live in the same household as the insured.") (internal quotation marks and citations omitted). While Adam apparently made a number of trips to the Downhill Drive residence in the months leading to his wedding, there is insufficient evidence in the record to support an inference that he and Laura established residency there following their marriage. At most, the record demonstrates that, in the months after their wedding, the couple returned to Erie for visits over long holiday weekends, staying either with Adam's parents or with Laura's. Their established residency, however, was in Virginia. *See Kaylor,* 2013 WL 11272836, at *3 ("[W]hen a person actually lives in one location, and sporadically visits, or keeps certain personal items at another location, it is the location where he lives that is his residence.").

IV. CONCLUSION

Although the events giving rise to this litigation are undeniably tragic, the Court is bound to apply the unambiguous terms of the insurance contracts in accordance with the governing legal principles discussed herein. For the reasons discussed, the Court concludes, somewhat reluctantly, that the Defendants are not entitled to the benefit of stacked UIM coverage because Adam and Laura were not residents of Paul and Rosanne McGeehan's household at the time of the accident in question. Based on this conclusion, Defendants' motion for partial summary judgment will be denied and Plaintiff's motion for summary judgment will be granted.

An appropriate Order follows.

*Susan Paradise Baxter*

Susan Paradise Baxter
United States District Judge

Dated: April 9, 2019